No. 22-11172

# In the United States Court of Appeals for the Fifth Circuit

———————————

CORNELIUS CAMPBELL BURGESS,
*APPELLEE/CROSS-APPELLANT,*

*v.*

JENNIFER WHANG, *in her official capacity as an Administrative Law Judge*; FEDERAL DEPOSIT INSURANCE CORPORATION; MARTIN J. GRUENBERG, *in his official capacity as Acting Chairman of the FDIC*; MICHAEL J. HSU, *in his official capacity as a Director of the FDIC*; ROHIT CHOPRA, *in his official capacity as a Director of the FDIC*,
*APPELLANTS/CROSS-APPELLEES.*

———————————

## *AMICUS CURIAE* BRIEF OF SEPARATION OF POWERS CLINIC IN SUPPORT OF APPELLEE/CROSS-APPELLANT CORNELIUS CAMPBELL BURGESS

———————————

JENNIFER L. MASCOTT
R. TRENT MCCOTTER*
  *Counsel of Record
Separation of Powers Clinic
Gray Center for the Study of the
  Administrative State
Antonin Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, VA 22201
(202) 706-5488
rmccotte@gmu.edu
Counsel for *Amicus Curiae*

## <u>STATEMENT OF INTERESTED PERSONS</u>

### <u>No. 22-11172 Burgess v. Whang et. al.</u>

Pursuant to Fifth Circuit Rule 29.2, undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Arthur E. Anthony

Manuel G. Berrelez

Joseph Brooks

Cornelius Campbell Burgess

Rohit Chopra

James T. Dawson

Federal Deposit Insurance Corporation

Martin J. Gruenberg

Michael A. Heidler

Herring Bancorp, Inc.

Herring Bank

James F. Hopper

Michael J. Hsu

Jennifer L. Mascott

R. Trent McCotter

Thomas P. Mitsch

Andrew A. Nicely

Separation of Powers Clinic, Antonin Scalia Law School

Madelyn C. Stanley

Vinson & Elkins LLP

Jennifer Whang

<u>/s/ R. Trent McCotter</u>

R. Trent McCotter

# **TABLE OF CONTENTS**

STATEMENT OF INTERESTED PERSONS ...................................... C-1

TABLE OF AUTHORITIES ...................................................................ii

INTEREST AND IDENTITY OF THE *AMICUS CURIAE* ...................... 1

SUMMARY OF THE ARGUMENT ........................................................ 2

ARGUMENT ........................................................................................ 4

I.      *Humphrey's Executor* Established Only a Narrow Exception to the President's Article II Power to Remove Principal Executive Officers. ............................................................................................ 4

II.     The FDIC Does Not Fall Within the Narrow *Humphrey's Executor* Exception ........................................................................................ 6

     A.    The Supreme Court's Understanding of the FTC's Powers in *Humphrey's Executor* ............................................................. 6

     B.    The FDIC's Executive Powers Greatly Exceed Those of the 1935 FTC ................................................................................ 8

III.    *Collins* and Recent Scholarship Provide Guidance on the Appropriate Harm and Remedy Frameworks .............................. 11

     A.    *Collins* Noted Several Helpful Distinctions for When a Sufficient Nexus Has Been Demonstrated ............................ 12

     B.    Scholarly Research Demonstrates that the Appropriate Remedy May Take Several Forms ......................................... 19

CONCLUSION .................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ............................................................. 18

*Barr v. American Ass'n of Political Consultants*,
  140 S. Ct. 2335 (2020) ........................................................ 22

*Bowsher v. Synar*, 478 U.S. 714 (1986) ................................. 22

*Buckley v. Valeo*, 424 U.S. 1 (1976) ....................................... 11

*CFPB v. Seila Law, LLC*, No. 8:17-cv-1081, 2017 WL
  6536586 (C.D. Cal. Aug. 25, 2017) .................................... 13

*Cochran v. SEC*, 20 F.4th 194 (5th Cir. 2021) (*en banc*) ........................ 17

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ................ 3, 11, 12, 14, 15, 16, 17

*Community Financial Services Ass'n of America v. CFPB*,
  51 F.4th 616 (5th Cir. 2022) ............................. 14, 15, 17, 18

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ............................................................ 4

*Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868 (1991) ................. 16

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund,
  Inc.*, 527 U.S. 308 (1999) ................................................... 18

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) ......................... 2, 3, 4, 5, 6, 7, 10, 11, 13

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) ............................ 5

*Lucia v. SEC*, 138 S. Ct. 2044 (2018) .................................... 16

*Myers v. United States*, 272 U.S. 52 (1926) ........................... 2, 6

*Nguyen v. United States*, 539 U.S. 69 (2003) .......................... 15

ii

*Seila Law LLC v. CFPB,*
  140 S. Ct. 2183 (2020) .................................. 2, 4, 5, 7, 10, 11, 13, 19, 20

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ...................... 10, 11

*Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021) ..................... 18

*Williams v. Pennsylvania*, 579 U.S. 1 (2016) .......................................... 15

## Constitution and Statutes

U.S. Const. art. II ................................................................................. 2, 4

12 U.S.C. § 1817 ........................................................................................ 8

12 U.S.C. § 1818 .................................................................................... 8, 10

12 U.S.C. § 1828 ........................................................................................ 8

Judiciary Act of 1789, 1 Stat. 78 ............................................................ 18

Banking Act of 1933, Pub. L. No. 73-66, 48 Stat. 162 (1933) ................ 22

Pub. L. No. 75-447, 52 Stat. 111 (1938) .................................................. 8

Financial Institutions Supervisory Act of 1966, Pub. L. No.
  89-695, 80 Stat. 1028 (1966) .............................................................. 23

Pub. L. No. 93-153, 87 Stat. 576 (1973) .................................................. 8

Pub. L. No. 93-637, 88 Stat. 2183 (1975) ................................................ 8

## Other Authorities

*Powers and Duties of the Fed. Trade Comm'n in the Conduct
  of Investigations*, 34 Op. Att'y Gen. 553 (1925) .................................... 7

William Baude, *Severability First Principles*, 109 Va. L. Rev.
  ___ (forthcoming 2023), *available at*
  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=40641
  56 ..................................................................... 19, 20, 21, 22

Federal Deposit Insurance Corporation, *Enforcement Decisions and Orders*, https://orders.fdic.gov/s/searchform ........... 9, 10

John Harrison, *Severability, Remedies, and Constitutional Adjudication*, 83 Geo. Wash. L. Rev. 56 (2014) ................................... 20

Brian Charles Lea, *Situational Severability*, 103 Va. L. Rev. 735 (2017) ......................................................................... 19, 20, 21, 22

Jennifer Mascott & John F. Duffy, *Executive Decisions After Arthrex*, 2021 Sup. Ct. Rev. 225 (2022) ................................................ 4

**INTEREST AND IDENTITY OF THE *AMICUS CURIAE*[1]**

The Separation of Powers Clinic at the Gray Center for the Study of the Administrative State, located within the Antonin Scalia Law School at George Mason University, was established during the 2021–22 academic year for the purpose of studying, researching, and raising awareness of the proper application of the U.S. Constitution's separation of powers constraints on the exercise of federal government power. The Clinic provides students an opportunity to discuss, research, and write about separation of powers issues in ongoing litigation.

The Clinic has submitted numerous briefs at the Supreme Court and other federal courts in cases implicating separation of powers. These include, as most relevant here, *Calcutt v. FDIC*, No. 20-4303 (6th Cir.), *cert. filed*, No. 22-714; *Consumers' Research v. Consumer Product Safety Commission*, No. 22-40328 (5th Cir.); and *American Home Furnishings Alliance v. U.S. Consumer Product Safety Commission*, No. 22-60639 (5th Cir.), all of which involve questions about the proper remedies for parties

---

[1] No counsel for any party has authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

subject to action by agencies led by officials shielded by removal protections found to present unconstitutional constraints on the President's vested Article II authority over the Executive Branch.

## SUMMARY OF THE ARGUMENT

The Supreme Court has held that Article II's vesting of executive power in the President, who must "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 1, cl. 1; *id.* § 3, provides the President with the power to remove most principal executive officers at will, *see Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191–92, 2197, 2199–2200 (2020); *Myers v. United States*, 272 U.S. 52, 163–64 (1926). The Court has also held that *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), established only a narrow exception to that principle "for multimember expert agencies that do not wield substantial executive power," a descriptor the Court applied to the Federal Trade Commission as it was understood to operate in 1935 when *Humphrey's Executor* was issued. *Seila Law*, 140 S. Ct. at 2199–2200; *see* Part I, *infra*.

The government does not dispute that a majority of the Directors of the Federal Deposit Insurance Corporation ("FDIC") enjoy statutory removal protections. Under *Humphrey's Executor* and *Seila Law*, those

protections are constitutional only if the FDIC does not "wield substantial executive power." *Seila Law*, 140 S. Ct. at 2199–2200. But the FDIC possesses and exercises significant executive powers far beyond those the Federal Trade Commission ("FTC") was understood to wield at the time of *Humphrey's Executor*. *See* Part II, *infra*. The FDIC can file civil suits, issue binding regulations, and bring administrative proceedings seeking crippling damages and other penalties, as relevant here. The FDIC has not been shy about exercising these powers, which the Supreme Court has labeled as quintessentially executive. Accordingly, the FDIC exercises substantial executive power, and the *Humphrey's Executor* exception to the President's at-will removal power cannot apply to any FDIC Directors.

The Supreme Court's decision in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), provides helpful guideposts for the showing required to demonstrate harm where executive officials—like most of the FDIC Directors here—both exercise executive power and possess removal protections. *See* Part III.A, *infra*. And recent scholarship, as well as separate writings by Justices Thomas and Gorsuch, provides further

guidance on how courts should conceptualize the remedy in such cases. *See* Part III.B, *infra*.

## ARGUMENT

I.  ***Humphrey's Executor* Established Only a Narrow Exception to the President's Article II Power to Remove Principal Executive Officers.**

Article II vests all executive power in the President and requires him to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. The Supreme Court has held that principal officers wielding quintessential executive powers typically must be removable at will by the President. *See Seila Law*, 140 S. Ct. at 2191–92, 2197, 2199–2200; *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010) ("'[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws.'"); Jennifer Mascott & John F. Duffy, *Executive Decisions After Arthrex*, 2021 Sup. Ct. Rev. 225, 226 (2022) (discussing the Court's recent application of the constitutional mandate that presidential and senior officers supervise executive decisional authority).

The Supreme Court has recognized a narrow exception under *Humphrey's Executor* for "multimember expert agencies that do not wield

substantial executive power." *Seila Law*, 140 S. Ct. at 2199–2200. This Court has further confirmed that merely being on a multimember commission is insufficient to trigger the "*Humphrey's Executor* exception." *Jarkesy v. SEC*, 34 F.4th 446, 464 n.19 (5th Cir. 2022). Rather, the multimember commission must *also* be "balanced along partisan lines," "perform[] legislative and judicial functions," and be "*said not to exercise any executive power.*" *Id.* (emphasis added).

The government has never disputed that a majority of the FDIC's Board of Directors have statutory protections from at-will removal. *See* Burgess Principal Br. 7. Under *Humphrey's Executor* and *Seila Law*, those removal protections are constitutional only if the FDIC does not wield executive power. *See Seila Law*, 140 S. Ct. at 2199–2200 ("substantial executive power"); *see also Jarkesy*, 34 F.4th at 464 n.19 ("any executive power").

As demonstrated next, however, the FDIC wields significant executive powers, far more than those the Supreme Court understood the FTC to exercise at the time of *Humphrey's Executor*.

II.   **The FDIC Does Not Fall Within the Narrow *Humphrey's Executor* Exception.**

A.   **The Supreme Court's Understanding of the FTC's Powers in *Humphrey's Executor*.**

In issuing its 1935 decision in *Humphrey's Executor*, the Supreme Court described the FTC as largely an advisory body preparing reports and conducting investigations for the benefit of Congress. *See* 295 U.S. at 628. The brief of Samuel F. Rathbun, who was Humphrey's executor, cited statistics showing that nearly half of the FTC's entire expenditures over the prior eight years had been on "investigations undertaken as such an agent of Congress in aid of legislation." Br. for Samuel F. Rathbun, Executor 46 & n.21, *Humphrey's Executor* (Mar. 19, 1935) ($4,036,470 spent on such legislative work, out of $9,627,407 total). And the brief of the United States, while arguing that *Myers* should control, still acknowledged the FTC's primary actions were investigating and issuing "[r]eports to Congress on special topics." Br. for United States 24, *Humphrey's Executor* (Apr. 6, 1935).

The Department of Justice had long held the view that the early FTC was more akin to a legislative committee than an executive agency. A 1925 Attorney General Opinion had stated, "A main purpose of the Federal Trade Commission Act was to enable Congress, through the

Trade Commission, to obtain full information concerning conditions in industry to aid it in its duty of enacting legislation," to the point that "the Commission was sometimes likened to a Committee of Congress." *Powers and Duties of the Fed. Trade Comm'n in the Conduct of Investigations*, 34 Op. Att'y Gen. 553, 557–58 (1925).

The government's brief in *Humphrey's Executor* further acknowledged that the 1935 FTC could not even directly "execute its orders," Br. for United States 25, *Humphrey's Executor*, and the Executor's brief noted that the FTC sometimes served as a chancery master appointed by a federal court, Br. for Rathbun 43, *Humphrey's Executor*.

In ultimately holding that the FTC did not wield executive power, the Court's opinion in *Humphrey's Executor* relied on the same characteristics of the FTC that the parties had emphasized, *i.e.*, its legislative and judicial functions. *See* 295 U.S. at 628. And the Supreme Court later held in *Seila Law* that the holding in *Humphrey's Executor* was directly premised on the fact that "the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" *Seila Law*, 140 S. Ct. at 2198.

It was not until 1938 that Congress first enacted legislation to provide the FTC with a limited right to sue in federal court, and those suits were limited to seeking preliminary injunctions against certain practices pending agency adjudication. *See* Pub. L. No. 75-447, § 4, 52 Stat. 111, 115 (1938). In the 1970s, Congress first provided the FTC with the significant litigation powers it now possesses. *See* Pub. L. No. 93-637, §§ 205–06, 88 Stat. 2183, 2200–02 (1975); Pub. L. No. 93-153, § 408(f), 87 Stat. 576, 592 (1973).

## B.   The FDIC's Executive Powers Greatly Exceed Those of the 1935 FTC.

The statutory authorities assigned to the FDIC suggest that it wields significantly more power than the 1935 FTC was understood to exercise, and those additional powers have executive character. The FDIC is empowered to issue binding regulations, bring civil suits seeking substantial monetary penalties and injunctions, and bring administrative proceedings seeking monetary and other significant penalties. 12 U.S.C. §§ 1817, 1818, 1828.

In particular, 12 U.S.C. § 1818(s) and § 1828 authorize the FDIC to issue regulations controlling a broad swath of U.S. banks and financial institutions. Section 1817(f) authorizes the FDIC to bring suits against

corporations for not filing reports in accordance with its regulations. Section 1818(b)–(c) authorizes the FDIC to issue "cease-and-desist orders" to prevent individuals or institutions from engaging in particular actions.

Section 1818(e) authorizes the FDIC to issue "removal and prohibition" sanction orders against individuals it finds violated its banking regulations after conducting administrative proceedings. These orders prohibit individuals from participating in any manner in the conduct of the affairs of any financial institution or agency enumerated in § 1818(e)(7)(A). According to the FDIC's own figures, between March 1, 2018, and March 1, 2023, the FDIC issued 148 "Order[s] of Prohibition from Further Participation."[2]

Section 1818(i)(2)—the provision at issue here—authorizes the FDIC to levy huge civil monetary penalties for violations of applicable laws and regulations through its administrative proceedings with

---

[2] *See* Federal Deposit Insurance Corporation, *Enforcement Decisions and Orders*, https://orders.fdic.gov/s/searchform (under "Issued date between," select "March 1, 2018" and "March 1, 2023," then select "Stipulated Orders and Written Agreements" under "Order Category" and "Removal/Prohibition Order" under "Action Type," then search the database) (last visited Mar. 20, 2023).

penalties of up to "$25,000 for each day during which such violation, practice, or breach continues" for "*reckless*[]" actions. 12 U.S.C. § 1818(i)(2)(B)(i)(II), (ii)(III) (emphasis added). If the action is committed "*knowingly*," the fine can be up to one million dollars per day. *Id.* § 1818(i)(2)(C)(i), (D)(i) (emphasis added). Under those provisions, penalties can quickly reach daunting figures. According to the FDIC's own figures, between March 1, 2018, and March 1, 2023, the FDIC imposed just under $40 million in civil fines, with numerous six- and seven-figure penalties in specific cases.[3]

The FDIC's significant powers are ones that the Supreme Court has indicated are *executive* in nature. For example, *Seila Law* held that "seek[ing] daunting monetary penalties against private parties on behalf of the United States in federal court" is a "quintessentially executive power" that was "not considered in *Humphrey's Executor*" because the FTC lacked that power at the time. 140 S. Ct. at 2200. Similarly, in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), the Court held that

---

[3] *See* Federal Deposit Insurance Corporation, *Enforcement Decisions and Orders*, https://orders.fdic.gov/s/searchform (under "Issued date between," select "March 1, 2018" and "March 1, 2023," then search the database and download and sum results) (last visited Apr. 5, 2023).

"the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch." *Id.* at 2207; *see Buckley v. Valeo*, 424 U.S. 1, 138 (1976) ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President . . . that the Constitution entrusts th[is] responsibility."). And the Court has held that an agency "empowered to issue a 'regulation or order' … clearly exercises executive power." *Collins v. Yellen*, 141 S. Ct. 1761, 1785–86 (2021); *see also Seila Law*, 140 S. Ct. at 2198 n.2 (agency enforcement actions for violations of regulations "are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'") (emphasis in original).

These are all "substantial executive power[s]" wielded by the FDIC but not by the 1935 FTC. *Seila Law*, 140 S. Ct. at 2199–2200. Accordingly, the narrow *Humphrey's Executor* exception to at-will Presidential removal of principal executive officers does not apply here.

## III.  *Collins* and Recent Scholarship Provide Guidance on the Appropriate Harm and Remedy Frameworks.

The Supreme Court has not conclusively established the appropriate test for whether a party has suffered cognizable harm where an agency enforcement action was issued or assigned by Federal officials

11

subject to removal protections that interfere with the President's Article II powers, nor has the Court established the appropriate remedy once harm is shown.

But the decision in *Collins*, as well as recent scholarly work, provides helpful guideposts for determining what suffices as sufficient harm and how courts should conceptualize the remedy for these "unconstitutional convergences"—i.e., where executive officials possess both executive power and removal protections.

## A.    *Collins* Noted Several Helpful Distinctions for When a Sufficient Nexus Has Been Demonstrated.

*Collins* itself provided several hints about what factors are relevant to a finding that removal protections caused a cognizable harm.

***Officials Who "Adopted" the Challenged Action***. Most significantly here, *Collins* seems to have drawn a distinction between officials who had taken a first-hand role in "*adopt[ing]*" the challenged action, and those subsequent officials who merely "supervised the implementation" of the already-in-motion challenged action. 141 S. Ct. at 1787, 1789 (emphasis in original). Although *Collins* did not elaborate on this possible distinction, it could be that removal powers are more likely to play a role where an official or group of officials initiate an action,

thereby identifying them as the sole individuals responsible for setting in motion the subsequent chain of events—and accordingly the people most responsible if the President is displeased with those actions. This also seems to have played a role in *Seila Law*, where the CFPB Director himself had ordered Seila Law to comply with the agency's demand. *See CFPB v. Seila Law, LLC*, No. 8:17-cv-1081, 2017 WL 6536586, at *1 (C.D. Cal. Aug. 25, 2017).

It is significant, therefore, that the FDIC Directors, the majority of whom enjoys removal protections, are the same ones who issued the first order of removal and prohibition against Burgess and then directly assigned the ALJ responsible for conducting the second enforcement proceeding against him, ROA.29–30, making them the individuals responsible for the challenged actions. Given that the power to "seek[] daunting monetary penalties against private parties on behalf of the United States" is a "quintessentially executive power" that was "not considered in *Humphrey's Executor*," the officials who approve such a central executive power should be subject to the President's control. 140 S. Ct. at 2200. This fact favors finding a nexus between Directors' removal protections and their challenged actions here.

Moreover, to the extent the FDIC ALJ herself is viewed as the official "adopting" the challenged action, that would only worsen the situation because, as Burgess explains, FDIC ALJs not only possess executive powers but are subject to numerous layers of removal protections, which would require the concurrence of at least nine individuals who are themselves tenure protected. *See* Burgess Principal Br. 10.

*Collins Did Not Establish a Nearly Insurmountable Test.* *Collins* also provided several especially clear-cut examples where a party would demonstrate harm from an improper removal restriction. 141 S. Ct. at 1789. This Court's subsequent decision in *Community Financial Services Ass'n of America v. CFPB*, 51 F.4th 616, 632 (5th Cir. 2022), overread that list of examples as dictating that such clear-cut evidence be definitively established to show harm.

But *Community Financial* addressed only the scenario of removing a single "unconstitutionally insulated actor," i.e., the CFPB Director. *Id.* It did not address a multi-headed agency like the FDIC, where the inherent nature of multi-lateral deliberations, often in secret, render it "neither possible nor productive to inquire whether the [official] in

14

question might have influenced the views of his or her colleagues during the decision-making process," and thus harm is presumed. *Williams v. Pennsylvania*, 579 U.S. 1, 14–15 (2016); *cf. Nguyen v. United States*, 539 U.S. 69, 83 (2003) (remanding, without requiring a showing of harm or prejudice, for "fresh consideration" by a full Article III circuit panel, after an Article IV judge had sat on the panel below, in violation of a statute).

Moreover, there is good reason not to extend *Community Financial*'s strict evidentiary burden to multi-headed agencies, as that test is inconsistent with *Collins* itself. There, the Supreme Court remanded to this Court to determine whether there was sufficient evidence of harm, as "[t]he *possibility* that the unconstitutional restriction on the President's power to remove a Director of the FHFA could have such an effect [of inflicting compensable harm] *cannot be ruled out*." 141 S. Ct. at 1789 (emphases added). If the type of extraordinary evidence demanded by *Community Financial* had been required, the Supreme Court would not have bothered remanding *Collins*, as the challengers had provided only sparse evidence of prejudice at that point. At the very least, *Collins* indicates an appellate court should remand for

further factfinding on the issue of harm, rather than reject the challenge outright.

Effectively foreclosing relief via an evidentiary threshold rarely satisfied would contravene the Supreme Court's oft-stated goal of "creat[ing] incentives to raise" challenges to unconstitutional provisions. *Lucia v. SEC*, 138 S. Ct. 2044, 2055 n.5 (2018); *see Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 879 (1991). Parties will not likely bother raising such challenges when the evidentiary threshold is set so high. The effects of this stagnation of law will extend far beyond any one dispute. Secure in the knowledge that removal protections are essentially unchallengeable, officers will be even less accountable to the President, and Congress may be incentivized to create more such provisions across the bureaucracy.

***Prospective v. Retrospective Relief.*** The Supreme Court in *Collins* also indicated that it is relevant whether the challengers seek relief that is prospective, as opposed to purely retrospective. The opinion distinguished the two and remanded for consideration of *retrospective* relief while noting there was no possibility of *prospective* relief, given

intervening agency actions. 141 S. Ct. at 1779–80. Here, there is no debate that Burgess seeks relief that is exclusively prospective.

To be sure, this Court's opinion in *Community Financial* concluded that *Collins* "did not rest on a distinction between prospective and retrospective relief." *Cmty. Fin.*, 51 F.4th at 631. But that is an unduly narrow view. *Collins* not only distinguished the two, but also acknowledged that the unavailability of one did not necessarily preclude the other. 141 S. Ct. at 1787. Moreover, this Court, sitting *en banc*, distinguished *Collins* on this same basis. *See Cochran v. SEC*, 20 F.4th 194, 210 n.16 (5th Cir. 2021) (*en banc*), *cert. granted*, 142 S. Ct. 2707 (2022).[4]

Further, it would be especially unusual to effectively foreclose the availability of *prospective* relief, as *Community Financial* purported to do, given the historic availability of injunctive relief against ongoing

---

[4] The Solicitor General's own brief in *Collins* noted the same distinction. *See* Reply & Resp. Br. of the U.S. at 28 & n.*, *Collins*, 2020 WL 6322317 (Oct. 23, 2020) (arguing that "equitable principles bar[red plaintiffs'] belated attempt to unravel a multibillion-dollar contract agreed to by Treasury" (a form of retrospective relief), but this rationale did "not undercut" the portion of the lower-court "judgment awarding a declaration that FHFA's structure violates the Constitution" (a form of prospective relief)).

constitutional violations. *See, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). This "negative injunction remedy" is a "'standard tool of equity' that federal courts have authority to entertain under their traditional equitable jurisdiction." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 540 (2021) (Thomas, J., concurring in part) (citation omitted). And this power generally extends "to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 327.

Thus, although courts lack "power to create remedies previously unknown to equity jurisprudence," *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 332 (1999), the negative injunction has roots in American equity dating back to the Judiciary Act of 1789, *see* § 11, 1 Stat. 78; *Whole Woman's Health*, 142 S. Ct. at 540 (Thomas, J., concurring in part), which itself "reflects a long history of judicial review of illegal executive action, tracing back to England," *Armstrong*, 575 U.S. at 327.

Because the high evidentiary barrier in *Community Financial* risks foreclosing the historic availability of prospective relief, this Court should decline to extend *Community Financial* to Burgess's challenge here.

**B.    Scholarly Research Demonstrates that the Appropriate Remedy May Take Several Forms.**

This case also implicates a developing area of law about the appropriate remedy for what scholars have titled "unconstitutional combinations" or "convergences," where two statutory provisions independently would be constitutional under judicial precedent but are unconstitutional when operating together.

"In some instances, a constitutional injury arises as a result of two or more statutory provisions operating together." *Seila Law*, 140 S. Ct. at 2222 (Thomas, J., concurring in part and dissenting in part); *see id.* at 2223 (referring to these situations as unconstitutional "convergence[s]"); Brian Charles Lea, *Situational Severability*, 103 Va. L. Rev. 735, 776 (2017) (same); William Baude, *Severability First Principles*, 109 Va. L. Rev. ___ (forthcoming 2023), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4064156 (manuscript last revised Mar. 30, 2022) (discussing these unconstitutional "combinations").

The Supreme Court has not conclusively resolved the appropriate remedy for unconstitutional convergences. But Justices Thomas and Gorsuch have suggested that the appropriate remedy is not to "sever"

either statutory provision (i.e., the removal protections or the executive powers) "based on nothing more than speculation as to what the Legislature would have preferred," but instead to deny the agency's attempt to engage in executive action in the particular case under consideration. *See Seila Law*, 140 S. Ct. at 2219–24 (Thomas, J., concurring in part and dissenting in part); *see also* Lea, *supra*, at 747 ("Because a legislative body usually will not have foreseen the potential problems with its handiwork, it will not have formed an intent regarding severability in the event of partial invalidity.").

Justices Thomas and Gorsuch explained that "[s]evering" one of the relevant statutory provisions would be inappropriate because it would excise a portion of a statute across the board, including for other parties and controversies not currently before the court. 140 S. Ct. at 2219–20 (Thomas, J., concurring in part and dissenting in part). That approach would be inconsistent with the traditional judicial role. "'[E]arly American courts did not have a severability doctrine'"; "[i]f a statute was unconstitutional, the court would just decline to enforce the statute in the case before it." *Id.* at 2219 (citing authorities); *see also* John Harrison, *Severability, Remedies, and Constitutional Adjudication*, 83 Geo. Wash.

L. Rev. 56, 82 (2014) ("Standard accounts of the Anglo-American law of remedies do not include the invalidation of statutes among the kinds of remedial orders that courts enter."). Here, this form of relief would suggest that the Court simply bar the ongoing enforcement action.

Several scholars have also written on the topic of unconstitutional combinations or convergences. *See generally* Baude, *supra*; Lea, *supra*. Professor Baude, for example, states the "general approach" proposed by Justice Thomas "is quite right," Baude, *supra*, at 24, although Baude offers some refinements and alternative approaches that he acknowledges may fit more or less appropriately based on the particulars of a given case, *id.* at 40–54. Brian Lea has argued for a slightly broader inquiry that looks to "whatever guidance [the court] can find concerning the legislature's likely intent as to which provision or provisions the court should ignore in adjudicating the case before it." Lea, *supra*, at 782. This includes "the text, structure, legislative history, and purpose of the statutory scheme." *Id.* at 781.

Baude and Lea agree that the goal should be to reduce judicial subjectivity when deciding which of the two "converging" provisions should be enforced. Baude, *supra*, at 3, 42; Lea, *supra*, at 782. For

example, Baude and Lea both note that Congress can expressly include a fallback provision stating "whether [Congress] would prefer Requirement A to prevail over Requirement B, if only one can prevail." Baude, *supra*, at 41; Lea, *supra*, at 780; *see, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 735–36 (1986) (applying express statutory fallback provision after finding separation of powers violation in Comptroller General's authority).

Professor Baude also contends that a court may look to other interpretive canons. One such canon is the principle that, where an amendment renders an otherwise valid statute unconstitutional, the amendment should be disregarded. *See* Baude, *supra*, at 42–43. That is what the Supreme Court did in *Barr v. American Ass'n of Political Consultants*, 140 S. Ct. 2335, 2353–54 (2020), where an amendment to a particular provision rendered the entirety unconstitutional under the First Amendment.

Applying that principle here would favor giving effect to the FDIC's undisputed protections from at-will removal by the President, which were added in 1933, *see* Banking Act of 1933, Pub. L. No. 73-66, ch. 89, 48 Stat. 162, 168 (1933), rather than its prohibition powers, which were

22

added in 1966 along with a score of other executive powers, *see* Financial Institutions Supervisory Act of 1966, Pub. L. No. 89-695, § 101, 80 Stat. 1028, 1030–32 (1966).

That approach furthers the interest in avoiding subjectivity and focusing on textual evidence of congressional intent that both Lea and Baude emphasize. It is also consistent with the historical evidence of Congress's intent. Congress clearly has been willing to create an FDIC with removal protections and no prohibition powers, because that is the way Congress originally established the agency. By contrast, there is no historical precedent for an FDIC with no removal protections but broad prohibition and enforcement powers. Eliminating the removal protections while leaving its enforcement powers intact would thus create an entity that Congress has never envisioned.[5]

---

[5] By contrast, the "last in time rule" should not save the FDIC's enforcement powers. *See* Baude, *supra*, at 44 (describing the principle that, "if one can't have both [provisions], one is supposed to prefer the one adopted later"). That principle is in tension with the strong presumption against implied repeal that the Court has applied for more than a century. *See id.* (citing *Barr*, 140 S. Ct. 2335; *Frost v. Corp. Comm'n*, 278 U.S. 515 (1929); *Truax v. Corrigan*, 257 U.S. 912 (1921); and *Eberle v. Michigan*, 232 U.S. 700 (1914)).

## CONCLUSION

The Court should reverse the District Court's denial of injunctive relief on Counts 1 and 2 of Burgess's complaint.

April 5, 2023                    Respectfully submitted,

                                         /s/ R. Trent McCotter
                                           JENNIFER L. MASCOTT
                                           R. TRENT MCCOTTER*
                                               *Counsel of Record
                                           Separation of Powers Clinic
                                           Gray Center for the Study of
                                                 the Administrative State
                                           Antonin Scalia Law School
                                           George Mason University
                                           3301 Fairfax Dr.
                                           Arlington, VA 22201
                                           (202) 706-5488
                                           rmccotte@gmu.edu
                                           Counsel for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2023, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/EFC filing system and that service will be accomplished using the appellate CM/ECF system.

/s/ R. Trent McCotter

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in 14-point Century Schoolbook, a proportionally spaced typeface, using Microsoft Word. Fed. R. App. P. 29(a), 32(g)(1). This brief complies with the type-volume limitation of Rule 29(a) because it contains 4502 words, excluding the parts exempted under Rule 32(f).

/s/ R. Trent McCotter