No. 22-11172

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

CORNELIUS CAMPBELL BURGESS,
*Plaintiff-Appellee/Cross-Appellant*,

vs.

JENNIFER WHANG, in her official capacity as an administrative law judge; FEDERAL DEPOSIT INSURANCE CORPORATION; MARTIN J. GRUENBERG, in his official capacity as acting chairman of the FDIC; MICHAEL J. HSU, in his official capacity as a director of the FDIC; ROHIT CHOPRA, in his official capacity as a director of the FDIC,
*Defendants-Appellants/Cross-Appellees*.

On Appeal from the United States District Court for the Northern District of Texas (Wichita Falls Division), No. 7:22-cv-00100-O, Hon. Reed O'Connor

## BRIEF OF *AMICUS CURIAE* THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF PLAINTIFF-APPELLEE/CROSS-APPELLANT AND AFFIRMANCE

JENNIFER B. DICKEY
KEVIN R. PALMER*
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, DC 20062

*Admitted in Massachusetts only. Practicing under the supervision of members of the D.C. Bar.*

STEVEN A. ENGEL
  *Attorney of Record*
MICHAEL H. MCGINLEY
JUSTIN W. AIMONETTI
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

BRIAN A. KULP
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

*Counsel for* Amicus Curiae

## CERTIFICATE OF INTERESTED PERSONS

No. 22-11172

Cornelius Campbell Burgess,
*Plaintiff-Appellee/Cross-Appellant*,

vs.

Jennifer Whang, in her official capacity as an administrative law judge; Federal Deposit Insurance Corporation; Martin J. Gruenberg, in his official capacity as acting chairman of the FDIC; Michael J. Hsu, in his official capacity as a director of the FDIC; Rohit Chopra, in his official capacity as a director of the FDIC, *Defendants-Appellants/Cross-Appellees*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1. **Cornelius Campbell Burgess**, Plaintiff-Appellee/Cross-Appellant, represented by:

    **Manuel G. Berrelez**
    **Michael A. Heidler**
    **James T. Dawson**
    **Thomas P. Mitsch**
    **James F. Hopper**
    **Madelyn C. Stanley**
    **VINSON & ELKINS LLP**

2. **Herring Bank**, a regional bank headquartered in Amarillo on whose board of directors Cornelius Campbell Burgess now serves as Vice Chair;

i

3.  **Herring Bancorp, Inc.**, the parent company of Herring Bank, on whose board of directors Cornelius Campbell Burgess now serves as Vice Chair;

4.  **Jennifer Whang**, **Federal Deposit Insurance Corporation**, **Martin J. Gruenberg**, **Michael J. Hsu**, and **Rohit Chopra**, Defendants-Appellants/Cross-Appellees, represented by:

> **Joseph Brooks**
> **Arthur E. Anthony**
> **Andrew A. Nicely**
> **FEDERAL DEPOSIT INSURANCE CORPORATION**

5.  **The Chamber of Commerce of the United States of America**, *Amicus Curiae*, represented by:

> **Steven A. Engel**
> **Michael H. McGinley**
> **Justin W. Aimonetti**
> **Brian A. Kulp**
> **DECHERT LLP**
>
> **Jennifer B. Dickey**
> **Kevin R. Palmer**
> **U.S. CHAMBER LITIGATION CENTER**

The Chamber of Commerce of the United States of America ("Chamber") is a nonprofit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

6.    **Washington Legal Foundation**, *Amicus Curiae*, represented by:

    **John M. Masslon II**
    **Cory L. Andrews**
    **WASHINGTON LEGAL FOUNDATION**

7.    **Pacific Legal Foundation**, *Amicus Curiae*, represented by:

    **Aditya Dynar**
    **John F. Kerkhoff**
    **PACIFIC LEGAL FOUNDATION**

8.    **CATO Institute**, *Amicus Curiae*, represented by:

    **Thomas A. Berry**
    **Isaiah McKinney**
    **CATO INSTITUTE**

9.    **New Civil Liberties Alliance**, *Amicus Curiae*, represented by:

    **Gergory Dolin**
    **Margaret A. Little**
    **Mark Chenoweth**
    **NEW CIVIL LIBERTIES ALLIANCE**


Dated: April 7, 2023

    */s/ Steven A. Engel*
    Steven A. Engel
    DECHERT LLP
    1900 K Street, NW
    Washington, DC 20006
    (202) 261-3369
    steven.engel@dechert.com

    *Attorney of record for* Amicus Curiae

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE*..............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................2

ARGUMENT ...............................................................................................5

I.     The District Court Had Jurisdiction To Entertain Burgess's Structural Constitutional Claims. .....................................................................5

II.    The District Court's Order Honors The Original Public Meaning Of The Seventh Amendment. .............................................................7

      A.    The FDIC's Jury-Less Administrative Courts Are Inconsistent With The Seventh Amendment. ..........................................8

          1.    The Colonists Viewed The Right To A Jury At Common Law As An Essential Check On Government Overreach..........8

          2.    The Crown's Decision To Expand Jury-Less Admiralty Courts Sparked Fierce Resistance In The Colonies..................9

          3.    The Founding Generation Insisted On The Civil Jury Right's Inclusion In The Bill of Rights. .................................12

          4.    The Supreme Court Has Interpreted The Seventh Amendment Consistent With Its Original Public Meaning. .................................................................14

      B.    The District Court Enforced The Seventh Amendment's Original Public Meaning. ...................................................15

      C.    The FDIC Cannot Rely On The "Public Rights" Exception Where Private Rights Are At Stake...................................16

III.   Even If The FDIC Could Seek Civil Penalties In An Administrative Court, Burgess Is Entitled To An Adjudication Before An ALJ That Is Not Impermissibly Shielded From The President's Removal Authority...............................................................................17

      A.    The Removal Restrictions For FDIC ALJs Are Unconstitutional. ......................................................18

          1.    FDIC ALJs Are Inferior Officers Who Exercise Significant Executive Power....................................20

      2.     FDIC ALJs Are Doubly Insulated From The President's Removal Authority.................................................................21

   B.     The District Court's Remedial Holding Is Flawed. ...........................23

CONCLUSION .......................................................................................28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akin v. Off. of Thrift Supervision,*
  950 F.2d 1180 (5th Cir. 1992) ...........................................................17

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n,*
  430 U.S. 442 (1977)..........................................................................16

*Baltimore & Carolina Line, Inc. v. Redman,*
  295 U.S. 654 (1935)..........................................................................14

*Blakely v. Washington,*
  542 U.S. 296 (2004)............................................................................9

*Bowsher v. Synar,*
  478 U.S. 714 (1986)................................................................2, 24, 25

*Burgess v. FDIC,*
  871 F.3d 297 (5th Cir. 2017) ......................................................20, 21

*Carr v. Saul,*
  141 S. Ct. 1352 (2021).........................................................................6

*Cochran v. SEC,*
  20 F.4th 194 (5th Cir. 2021) (en banc) ...............................4, 25, 26, 27

*Colgrove v. Battin,*
  413 U.S. 149 (1973)..........................................................................12

*Collins v. Yellen,*
  141 S. Ct. 1761 (2021).............................................................24, 25, 26

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
  51 F.4th 616 (5th Cir. 2022) .........................................................25, 26

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010).....................................................................*passim*

*Granfinanciera, S.A. v. Nordberg,*
  492 U.S. 33 (1989) .................................................................................. 15

*Hester v. United States,*
  139 S. Ct. 509 (2019) .............................................................................. 16

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935) ................................................................................ 19

*Jarkesy v. SEC,*
  34 F.4th 446 (5th Cir. 2022) ........................................................... *passim*

*Lucia v. SEC,*
  138 S. Ct. 2044 (2018) .............................................................. 19, 20, 21

*McNary v. Haitian Refugee Ctr., Inc.,*
  498 U.S. 479 (1991) .................................................................................. 7

*Morrison v. Olson,*
  487 U.S. 654 (1988) ................................................................................ 19

*Myers v. United States,*
  272 U.S. 52 (1926) .................................................................................. 18

*Parklane Hosiery Co. v. Shore,*
  439 U.S. 322 (1979) ................................................................................ 13

*Parsons v. Bedford,*
  28 U.S. (3 Pet.) 433 (1830) .................................................................... 14

*Rhoades v. Casey,*
  196 F.3d 592 (5th Cir. 1999) ..................................................................... 5

*Seila Law LLC v. CFPB,*
  140 S. Ct. 2183 (2020) .................................................... 4, 18, 19, 23

*Thompson v. Dallas City Attorney's Off.,*
  913 F.3d 464 (5th Cir. 2019) .................................................................. 26

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) .................................................................................. 6

*Tull v. United States,*
    481 U.S. 412 (1987) ...................................................................15, 17

*United States v. Wonson,*
    28 F. Cas. 745 (C.C.D. Mass. 1812) ...............................................14

*Webster v. Doe,*
    486 U.S. 592 (1988) ..........................................................................5

**Constitutional Provisions**

U.S. Const. amend. VII ..........................................................................13

U.S. Const. art. II, § 1, cl. 1 ..................................................................18

U.S. Const. art. II, § 2, cl. 2 ....................................................................4

U.S. Const. art. II, § 3 ...........................................................................18

U.S. Const. art. III, § 2, cl. 3 ...................................................................3

**Statutes**

5 U.S.C. § 1202(d) .................................................................................22

5 U.S.C. § 7521(a) .................................................................................22

12 U.S.C. § 1813(q) ...............................................................................22

12 U.S.C. § 1818(b) ...............................................................................17

12 U.S.C. § 1818(i)(1) ..........................................................................5, 6

12 U.S.C. § 1818(i)(2) ............................................................................17

28 U.S.C. § 1331 ..................................................................................5, 7

28 U.S.C. § 2201 .....................................................................................7

Financial Institutions Reform, Recovery, and Enforcement Act of
    1989, Pub. L. No. 101-73, 103 Stat. 183 ........................................22

Judiciary Act of 1789, 1 Stat. 73.............................................................14

**Regulations**

12 C.F.R. § 308.3 ...................................................................22

12 C.F.R. § 308.5(b) ..............................................................20

12 C.F.R. § 308.5(b)(1) ..........................................................20

12 C.F.R. § 308.5(b)(2) ..........................................................20

12 C.F.R. § 308.5(b)(3) ..........................................................20

12 C.F.R. § 308.5(b)(4) ..........................................................20

12 C.F.R. § 308.5(b)(5) ..........................................................20

12 C.F.R. § 308.5(b)(7) ..........................................................20

12 C.F.R. § 308.5(b)(8) ..........................................................20

12 C.F.R. § 308.5(b)(10) ........................................................20

12 C.F.R. § 308.5(b)(11) ........................................................20

12 C.F.R. § 308.25(h) ............................................................20

12 C.F.R. § 308.26(c) .............................................................20

12 C.F.R. § 308.27(d) ............................................................20

12 C.F.R. § 308.103 ...............................................................22

12 C.F.R. § 308.108(d)(1) .......................................................20

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction*
    (1998) ...........................................................................13

1 *Annals of Cong.* (1789) (Joseph Gales ed., 1834) ..............18

3 William Blackstone, *Commentaries on the Laws of England* (1768) ...................9

Cincinnatus II: To James Wilson, Esquire (Nov. 8, 1787),
    bit.ly/3Glv74b ..............................................................13

*The contents of Magna Carta*, UK Parliament, bit.ly/3KF2Qb8 ............................. 8

The Declaration of Independence (U.S. 1776) ....................................... 11

Essays by a Farmer No. 4 (Mar. 21, 1788), in 5 *The Complete Anti-Federalist* (Herbert J. Storing ed., 1981) ............................................. 13

The Federalist No. 47 (James Madison) (Clinton Rossiter ed., 1961) ..................... 2

The Federalist No. 70 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ............................................................................. 23

The Federalist No. 83 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ............................................................................. 12

Philip Hamburger, *Is Administrative Law Unlawful?* (2014) ......................... *passim*

*Heritage Guide to the Constitution* (David F. Forte & Matthew Spalding eds., 2d ed. 2014) ........................................................ 13, 14

Harold M. Hyman & Catherine M. Tarrant, *Aspects of American Trial Jury History*, in *The Jury System in America: A Critical Overview* (Rita J. Simon ed., 1975) ...................................................... 9

1 *Journals of the Continental Congress 1774–1789* (Oct. 14, 1774) ..................... 11

2 *Journals of the Continental Congress 1774–1789* (July 6, 1775) ...................... 11

Renée Lettow Lerner, *The Failure of Originalism in Preserving Constitutional Rights to Civil Jury Trial*, 22 Wm. & Mary Bill Rts. J. 811 (2014) .................................................................. 10

Letter from George Washington to the Marquis de Lafayette (Apr. 28, 1788), in 9 *The Writings of George Washington* (Jared Sparks ed., 1835) ........................................................................ 12

Letter from John Adams to Ebenezer Thayer (Sept. 24, 1765), bit.ly/3zl0Ezn ................................................................. 10

Thomas J. McSweeney, *Magna Carta and the Right to Trial by Jury*, in *Magna Carta: Muse & Mentor* (Randy J. Holland ed., 2014) ................... 8

James Oldham, *Trial by Jury: The Seventh Amendment and Anglo-American Special Juries* (2006) ................................................. 8

*Records of the Colony of New Plymouth in New England: Laws,*
    *1623–1682* (David Pulsifer ed., 1861)...................................................9

1 John P. Reid, *Constitutional History of the American Revolution:*
    *The Authority of Rights* (1986) ..........................................................10

Resolutions of the Stamp Act Congress (Oct. 19, 1765).........................................11

Resolves of the Pennsylvania Assembly on the Stamp Act, September
    21, 1765, bit.ly/3ZJrjAp.....................................................................10

"To the Printers," Boston Gazette and Country Journal (July 15, 1765) ................11

## INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

Businesses, and corporate officers and directors, are frequent respondents in administrative enforcement actions brought by the Federal Deposit Insurance Corporation ("FDIC") and by other federal agencies who regulate their day-to-day activities nationwide.  The Chamber has a significant interest in ensuring that those proceedings respect the Constitution's structural limitations.  Specifically, the Chamber submits this brief to ensure that respondents are afforded their Seventh Amendment right to a jury trial and that the agency officials who conduct such proceedings remain accountable to the President under Article II of the Constitution.

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, contributed money intended to fund the preparation or submission of this brief.  Counsel for all parties have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This appeal presents yet another case of an administrative agency exceeding constitutional limits.  The Framers recognized that "structural protections against abuse of power [are] critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).  This is because "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny."  The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 1961).  Accordingly, among other protections, the Constitution separated the executive power from the judicial; required that the unitary executive remain accountable to the people; and granted the right to trial by jury as a further check against government overreach.

The administrative state has eroded these safeguards, a fact that Campbell Burgess knows all too well.  For more than a dozen years, he has been trapped in the bureaucratic machinery of the FDIC.  The FDIC began its investigation in 2010 and charged him in 2014.  Since then, he has yet to receive his day in federal court.  Instead, he has had to defend himself before an agency serving as prosecutor, judge, and jury against the backdrop of an enforcement proceeding riddled with constitutional infirmities.  And Burgess's case is not unique.  This appeal implicates recurring constitutional problems with enforcement proceedings before the FDIC and many other agencies.

2

The District Court properly held that the FDIC's jury-less enforcement proceeding violates the Seventh Amendment.  The right to a trial by jury "is a 'fundamental' component of our legal system 'and remains one of our most vital barriers to governmental arbitrariness.'" *Jarkesy v. SEC*, 34 F.4th 446, 452 (5th Cir. 2022) (citation omitted).  The American people insisted upon the Seventh Amendment precisely because they feared that the federal government might dispense with the jury in seeking to enforce federal law.

In the 1760s, British authorities expanded admiralty jurisdiction to enforce unpopular Acts of Parliament without the involvement of juries.  The Declaration of Independence identified the deprivation of the jury right among its grievances against the Crown, and the Constitution secured that right in criminal cases.  *See* U.S. Const. art. III, § 2, cl. 3.  But the American people demanded more.  They refused to tolerate the possibility that the federal government might pursue enforcement actions for monetary penalties before jury-less tribunals.

Despite the express text of the Seventh Amendment, the FDIC here seeks to do precisely what the people said could not be done—impose civil penalties upon Burgess absent the judgment of a jury of his peers.  The District Court's order enjoining the FDIC follows from this Court's decision in *Jarkesy* and honors the original public meaning of the Seventh Amendment.

3

The District Court erred, however, in holding that Burgess's additional challenge to the insulation of the FDIC ALJ was unlikely to succeed. Under the Constitution, "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020) (citations omitted). ALJs qualify as "Officers of the United States" within the Executive Branch. U.S. Const. art. II, § 2, cl. 2. Yet they are unconstitutionally insulated from presidential supervision by multiple layers of tenure protection. Those layers of protection "subvert[] the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010).

Even if the enforcement proceeding against Burgess could properly be brought in an Article II tribunal, then it must at a minimum be overseen by an accountable officer. It is not. And *Free Enterprise Fund* confirms that this unconstitutional structure creates "a here-and-now injury" that the courts can remedy. *Id.* at 513 (quotation marks omitted); *see also Cochran v. SEC*, 20 F.4th 194, 210 n.16 (5th Cir. 2021) (en banc), *cert. granted*, 142 S. Ct. 2707 (2022). The District Court overlooked that precedent in favor of decisions limiting efforts to unwind *past* agency action. But those decisions do not stop a regulated party from demanding a constitutionally structured proceeding in advance. Indeed, such a

prospective action is the only meaningful way that regulated parties may ensure constitutionally adequate adjudications.

## ARGUMENT

### I.    The District Court Had Jurisdiction To Entertain Burgess's Structural Constitutional Claims.

As a threshold matter, the Chamber agrees that the District Court had jurisdiction.  Congress has vested the district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  And though Congress may limit that jurisdiction, its intent "to preclude judicial review of constitutional claims . . . must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988).

No such clarity exists here.  The government seeks refuge in 12 U.S.C. § 1818(i)(1), which provides that "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under [§ 1818]."  *See* FDIC Br. at 20–38.  This provision may bar federal courts from second-guessing the merits of ongoing FDIC proceedings.  *See, e.g.*, *Rhoades v. Casey*, 196 F.3d 592, 597 (5th Cir. 1999).  Yet § 1818(i)(1) should not be read to bar judicial review where, as here, the regulated party raises structural constitutional claims that are wholly collateral to the merits.  After all, judicial review of such claims does not "affect" the "issuance" of any particular "notice or order under

5

[§ 1818].” *See* 12 U.S.C. § 1818(i)(1).  It simply ensures that the enforcement target receives a constitutionally structured proceeding.

The government's contrary reading—that courts may only review structural claims after the agency has completed all proceedings—has little to speak in its favor.  The "[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994) (citation omitted).  And agencies are particularly "ill suited to address structural constitutional challenges," which fall outside their expertise.  *Carr v. Saul*, 141 S. Ct. 1352, 1360 (2021).  Those claims are instead the bread and butter of Article III courts.

It would make little sense—and would raise constitutional concerns, *see* Burgess Br. at 23—for Congress to deny "meaningful judicial review" of structural challenges "wholly collateral to a statute's review provisions" by channeling them through an agency that cannot effectively adjudicate them.  *Free Enter. Fund*, 561 U.S. at 489 (citation omitted).  And forcing private parties to suffer through years of agency proceedings before unaccountable adjudicators as a precondition to judicial review inflicts immediate and irreparable harm.

As Burgess can attest, FDIC enforcement actions may take years, cost millions in legal fees, subject targets to ruinous penalties, and cause grave reputational injury.  When faced with such crushing litigation costs, enforcement

targets often have no choice but to succumb to intense settlement pressures. As a result, the "price" of having to endure a constitutionally deficient proceeding "is tantamount to a complete denial of judicial review for most." *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496–97 (1991). But parties haled before the FDIC in enforcement proceedings need not "bet the farm" just to wait to argue in federal court that the agency's proceedings are inherently unconstitutional. *See Free Enter. Fund*, 561 U.S. at 490 (citation omitted). They are entitled, under 28 U.S.C. §§ 1331 and 2201, to seek prospective relief in federal court.

In short, federal courts exist in large part to ensure that ongoing constitutional violations do not run their course. Congress did not disturb that tradition in 18 U.S.C. § 1818(i)(1)—and it certainly did not do so clearly. Accordingly, the District Court correctly exercised jurisdiction to review Burgess's structural constitutional claims.

## II. The District Court's Order Honors The Original Public Meaning Of The Seventh Amendment.

The District Court properly concluded that the structure of the FDIC's enforcement scheme denies Burgess his Seventh Amendment right to be tried by a jury of his peers. That decision follows from this Court's recent ruling in *Jarkesy* and is consistent with the Seventh Amendment, which preserves the people's traditional role in checking the federal government's coercive power. The FDIC's effort to levy a monetary penalty against Burgess without a jury resembles the

admiralty courts of the founding era, which provided one ground for the Declaration of Independence and led directly to the preservation of the civil jury in the Bill of Rights.

## A.    The FDIC's Jury-Less Administrative Courts Are Inconsistent With The Seventh Amendment.

### 1.    The Colonists Viewed The Right To A Jury At Common Law As An Essential Check On Government Overreach.

The common law jury dates back at least to the twelfth century and is recognized in Magna Carta itself. *See* Thomas J. McSweeney, *Magna Carta and the Right to Trial by Jury*, in *Magna Carta: Muse & Mentor* 139, 139–40 (Randy J. Holland ed., 2014). Clause 39 declared that "[n]o free man shall be seized, imprisoned, dispossessed, outlawed, exiled or ruined in any way, nor in any way proceeded against, except by the lawful judgement of his peers." *The contents of Magna Carta*, UK Parliament, bit.ly/3KF2Qb8 (last visited Apr. 7, 2023). And from there, the "modern model of trial by jury" developed by the sixteenth century. James Oldham, *Trial by Jury: The Seventh Amendment and Anglo-American Special Juries* 3 (2006).

Although civil juries became accepted practice in common law courts, that practice did not extend to the courts of equity or to the infamous Star Chamber. *See* Philip Hamburger, *Is Administrative Law Unlawful?* 148–49 (2014). But that reality did little to diminish the jury's central role in the minds of Englishmen. To William

Blackstone, the right to a jury trial at common law ranked sacrosanct because a person's rights and property hinged on "the unanimous consent of twelve of his neighbours and equals," not just government functionaries. 3 William Blackstone, *Commentaries on the Laws of England* 379 (1768); *see also Blakely v. Washington*, 542 U.S. 296, 306 (2004) (recognizing the jury as the "circuitbreaker in the State's machinery of justice").

Like their British brethren, the American colonists viewed civil juries as essential to safeguard their fundamental rights. The Plymouth Colony included the right to trial by jury in its early laws. *See Records of the Colony of New Plymouth in New England: Laws, 1623–1682*, at 3 (David Pulsifer ed., 1861). Virginia also provided the right to a jury in civil cases. *See* Harold M. Hyman & Catherine M. Tarrant, *Aspects of American Trial Jury History*, in *The Jury System in America: A Critical Overview* 23, 24 (Rita J. Simon ed., 1975). And other colonies followed suit. *See id.* at 25. Such widespread adoption of the civil jury reinforced the understanding that the jury served as a central check against government overreach.

## 2. The Crown's Decision To Expand Jury-Less Admiralty Courts Sparked Fierce Resistance In The Colonies.

As the United States approached independence, the Crown understood that the jury system threatened the efficient enforcement of unpopular parliamentary edicts. In the 1760s, Parliament expanded the jurisdiction of the jury-less admiralty courts from maritime cases to a range of cases traditionally tried in common law

courts. The Stamp Act of 1765, for instance, required printed documents in the colonies to bear a revenue stamp, with violations to be tried in the jury-less admiralty courts. *See* Hamburger, *supra*, at 150. These proceedings deprived colonists of civil jury trials in cases with significant property and legal rights on the line.

In response, Bostonians ranked "the Jurisdiction of the Admiralty"—next to taxation without representation—as their "greatest Grievance." 1 John P. Reid, *Constitutional History of the American Revolution: The Authority of Rights* 177 (1986); *see also* Renée Lettow Lerner, *The Failure of Originalism in Preserving Constitutional Rights to Civil Jury Trial*, 22 Wm. & Mary Bill Rts. J. 811, 818 (2014). John Adams captured that mood, declaring that "the most cruel" and "unjust Innovation" of the Stamp Act was "the alarming Extension of the Powers of Courts of Admiralty . . . . In these Courts, one Judge alone, presides. No Juries, have any Concern there." Letter from John Adams to Ebenezer Thayer (Sept. 24, 1765), bit.ly/3zl0Ezn (last visited Apr. 7, 2023).[2]

---

[2]  *See also, e.g.*, Resolves of the Pennsylvania Assembly on the Stamp Act, September 21, 1765, bit.ly/3ZJrjAp (last visited Apr. 7, 2023) ("[T]he vesting and Authority in the Courts of Admiralty to decide in Suits relating to the Stamp Duty, and other Matters, foreign to their proper Jurisdiction, is highly dangerous to the Liberties of his Majesty['s] American Subjects, contrary to Magna Charta, the great Charter and Fountain of English Liberty, and destructive of one of their most darling and acknowledged Rights, that of Trials by Juries."); Hamburger, *supra*, at 151 ("[h]ow are our new laws to be adjudged and executed? Is not our property . . . to be thrown into a prerogative court? a court of admiralty? and there to be adjudged,

In the first collective action against British tax policy, nine colonies formed the Stamp Act Congress of 1765 to protest the new measure. That Congress objected to the jury-less admiralty courts, resolving that "trial by jury is the inherent and invaluable right of every British subject in these colonies," and "by extending the jurisdiction of the courts of Admiralty beyond its ancient limits," the Stamp Act and similar acts "have a manifest tendency to subvert the rights and liberties of the colonists." Resolutions of the Stamp Act Congress (Oct. 19, 1765). Both the First and Second Continental Congresses raised parallel objections. *See* 1 *Journals of the Continental Congress 1774–1789*, at 69 (Oct. 14, 1774); 2 *Journals of the Continental Congress 1774–1789*, at 145 (July 6, 1775).

The Crown's continued reliance on admiralty courts was a significant factor in pushing the colonists toward independence. *See* Hamburger, *supra*, at 243. The Declaration of Independence identified among its list of grievances, "depriving [the colonists] in many cases, of the benefits of Trial by Jury." The Declaration of Independence para. 20 (U.S. 1776). Americans understood the vital importance of the jury, and the Crown's decision to channel enforcement actions away from them served as a major catalyst for the Revolutionary War. *See* Hamburger, *supra*, at 151.

---

forfeited, and condemned without a jury?" (alterations in original) (quoting "To the Printers," Boston Gazette and Country Journal (July 15, 1765)).

### 3.     The Founding Generation Insisted On The Civil Jury Right's Inclusion In The Bill of Rights.

Despite this history, the civil jury right was not initially included in the Constitution.  Several Framers proposed such a guarantee, but they could not agree how to phrase it, given local variation among the States.  *See Colgrove v. Battin*, 413 U.S. 149, 153 & n.8 (1973) (summarizing history).  According to George Washington, the Convention left the issue "as a matter of future adjustment" because of "the difficulty of establishing a mode, which should not interfere with the fixed modes of any of the States."  Letter from George Washington to the Marquis de Lafayette (Apr. 28, 1788), in 9 *The Writings of George Washington* 354, 357–58 (Jared Sparks ed., 1835).

The Constitution's omission of the civil jury right proved a stumbling block for ratification.  As Alexander Hamilton admitted, "[t]he objection to the plan of the convention, which has met with most success in this State, and perhaps in several of the other States, is that relative to the want of a constitutional provision for the trial by jury in civil cases."  The Federalist No. 83, at 494 (Alexander Hamilton) (emphasis omitted).  The people recalled the Crown's efforts to circumvent civil juries for administrative forums to deprive them of their property, and they feared

that, without an express constitutional constraint, the federal government might be tempted to follow suit.[3]

Thus, several States conditioned ratification on the inclusion of a civil jury-trial right.  *See* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 89–90 (1998).  As then-Justice Rehnquist recounted, the Anti-Federalists' "pleas struck a responsive chord in the populace, and the price exacted in many States for approval of the Constitution was the appending of a list of recommended amendments, chief among them a clause securing the right of jury trial in civil cases."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 342 (1979) (Rehnquist, J., dissenting).  Soon after, the Seventh Amendment passed the First Congress without debate.  *See Heritage Guide to the Constitution* 464 (David F. Forte & Matthew Spalding eds., 2d ed. 2014).

The Amendment prescribes that: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."  U.S. Const. amend. VII.

---

[3] *See* Cincinnatus II: To James Wilson, Esquire (Nov. 8, 1787), bit.ly/3Glv74b (last visited Apr. 7, 2023) (lamenting that "the trial by jury does seem to be taken away in civil cases"); Essays by a Farmer No. 4 (Mar. 21, 1788), in 5 *The Complete Anti-Federalist* 36, 38 (Herbert J. Storing ed., 1981) ("The trial by jury is—the democratic branch of the judiciary power—more necessary than representatives in the legislature[.]" (emphasis omitted)).

The text preserved the "traditional distinction between cases at law and those in equity or admiralty, where there normally was no jury." *Heritage Guide*, *supra*, at 464. The Judiciary Act of 1789 made the same distinction. *See* Judiciary Act of 1789, § 9, 1 Stat. 73, 77. But that line was to be enforced rigorously. The public refused to accept the federal government "shifting proceedings from the courts to administrative hearings" when the government targeted the life, liberty, or property of citizens. Hamburger, *supra*, at 154.

> **4. The Supreme Court Has Interpreted The Seventh Amendment Consistent With Its Original Public Meaning.**

The Supreme Court has consistently interpreted the Seventh Amendment to preserve the jury trial right as it existed in 1791. Starting in *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433 (1830), the Court explained that "suits at common law" involved "legal rights" as opposed to those involving "equitable rights alone." *Id.* at 446–47. The Seventh Amendment preserves a right to a civil jury where a lawsuit implicates legal rights, *see id.* at 447, which historically turned on the remedy sought by the plaintiff, *see Baltimore & Carolina Line, Inc. v. Redman*, 295 U.S. 654, 657 (1935) ("The aim of the amendment . . . is to preserve the substance of the common-law right of trial by jury[.]"); *see also United States v. Wonson*, 28 F. Cas. 745, 750 (C.C.D. Mass. 1812) (Story, J.) (explaining that the Seventh Amendment does not refer to "the common law of any individual state, (for it probably differs in all)," but to "the common law of England, the grand reservoir of all our jurisprudence").

The federal courts thus apply this "historical test" in considering the nature of the case and the remedy sought to determine whether a jury is required. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989); *Jarkesy*, 34 F.4th at 452–53. And the Supreme Court has confirmed that a government action seeking to impose civil penalties for a statutory violation is the kind of suit that historically would have been heard before a jury. *See Tull v. United States*, 481 U.S. 412, 422 (1987) ("A civil penalty was a type of remedy at common law that could only be enforced in courts of law."). Indeed, given the strong objections to the Stamp Act, it could hardly be otherwise.

### B.    The District Court Enforced The Seventh Amendment's Original Public Meaning.

The District Court honored the original public meaning of the Seventh Amendment in concluding that the FDIC would likely violate Burgess's right to a civil jury. This Court has already held that "the jury-trial right applies to . . . penalties action[s]" brought by the SEC. *Jarkesy*, 34 F.4th at 454. And the FDIC points to no good reason why that decision does not apply with full force here.

The FDIC's pursuit of civil enforcement penalties in a jury-less administrative tribunal resembles the British admiralty courts that sought to deprive colonists of their legal rights. Allowing the FDIC to adjudicate classically private rights is akin to reviving "the prerogative exercise of judicial power—the imposition of binding adjudication outside the courts"—which the Constitution's ratifying public viewed

as a great affront to fundamental liberties. *See* Hamburger, *supra*, at 228. The federal government may not reinstitute an admiralty-court lookalike after our forebearers labored to halt those jury-less proceedings once and for all. *See, e.g.*, *Hester v. United States*, 139 S. Ct. 509, 511 (2019) (Gorsuch, J., dissenting from the denial of certiorari) ("[I]t's hard to see why the right to a jury trial should mean less to the people today than it did to those at the time of the Sixth and Seventh Amendments' adoption.").

### C.    The FDIC Cannot Rely On The "Public Rights" Exception Where Private Rights Are At Stake.

The FDIC leans heavily on the so-called "public rights" exception to justify its admiralty-court-like deprivation of Burgess's jury trial right. *See* FDIC Br. at 41–45. As the FDIC sees it, the case "boils down to whether section 1818 enforcement claims involve solely public rights." *Id.* at 42. But this case does not involve "solely" public rights. The FDIC seeks to impose civil penalties upon Burgess; that penalty relates to a quintessential private right. *See Jarkesy*, 34 F.4th at 457–58; ROA.348.

The Supreme Court has recognized that cases may be heard by administrative tribunals where the remedies implicate "public rights." *See Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 455 (1977). But the public rights exception applies when the cause of action and its remedies were "unknown to the common law" and where jury trials would effectively "dismantle

the statutory scheme." *Jarkesy*, 34 F.4th at 453 (citation omitted). This Court has already determined that this exception does not apply to a quest for monetary sanctions like this one. *See id.* at 451–59. A statutory cause of action seeking civil monetary penalties is akin to a common-law action. *Id.* at 453–55. And the use of a jury to adjudicate such a claim would hardly upend the statutory scheme. *See id.* at 455–56; *see also* Burgess Br. at 41–44.

The FDIC seeks to avoid *Jarkesy* by arguing that this Court upheld the FDIC's authority to proceed without a jury in *Akin v. Office of Thrift Supervision,* 950 F.2d 1180 (5th Cir. 1992). *See* FDIC Br. at 44–45. But, as Burgess's brief explains, *Akin* provides no help because it involved a cease-and-desist order—a quintessential form of equitable relief—not a civil monetary penalty. *See* Burgess Br. at 45. And that distinction makes all the difference. In *Akin*, the FDIC sought *equitable* remedies under 12 U.S.C. § 1818(b). *See Akin*, 950 F.2d at 1183. By contrast, the FDIC here proceeds under § 1818(i)(2), which authorizes the imposition of civil monetary penalties—a classic "type of remedy at common law." *Jarkesy*, 34 F.4th at 454 (quoting *Tull*, 481 U.S. at 422). *Akin* therefore does not apply.

### III. Even If The FDIC Could Seek Civil Penalties In An Administrative Court, Burgess Is Entitled To An Adjudication Before An ALJ That Is Not Impermissibly Shielded From The President's Removal Authority.

Though the District Court correctly held that the FDIC's proceeding violates the Seventh Amendment, it erred in concluding that Burgess was unlikely to succeed

17

on his ALJ removal claim. Even if the FDIC could proceed against Burgess without a jury, he would be entitled, at a minimum, to a constitutionally accountable adjudicator.

### A.    The Removal Restrictions For FDIC ALJs Are Unconstitutional.

Article II provides that "[t]he executive Power shall be vested in a President." U.S. Const. art. II, § 1, cl. 1. "The entire 'executive Power' belongs to the President alone." *Seila Law*, 140 S. Ct. at 2197. But because the President "alone and unaided" cannot perform all the Nation's executive functions, he necessarily must rely on "the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926).

At the same time, "[t]hese lesser officers must remain accountable to the President, whose authority they wield." *Seila Law*, 140 S. Ct. at 2197. After all, it is the President's solemn duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. And because "[t]he buck stops with the President," he "must have some 'power of removing those for whom he can not continue to be responsible.'" *Free Enter. Fund*, 561 U.S. at 493 (quoting *Myers*, 272 U.S. at 117). To hold otherwise "would make it impossible for the President" to fulfill his constitutional prerogative, and to "keep [his] officers accountable" to the law and the people whom he serves. *Seila Law*, 140 S. Ct. at 2198 (citations omitted); *see* 1 *Annals of Cong.* 518 (1789) (Joseph Gales ed., 1834) (James Madison) (explaining

that the President's removal power is necessary to preserve "the chain of dependence" and ensure that "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community").

That said, "not all removal restrictions are constitutionally problematic" under existing caselaw. *Jarkesy*, 34 F.4th at 463. The Court has carved out "two exceptions to the President's unrestricted removal power"—"one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2198–2200; *see Morrison v. Olson*, 487 U.S. 654, 691 (1988); *Humphrey's Executor v. United States*, 295 U.S. 602, 628–29 (1935).

But this case involves neither. FDIC ALJs are "Officers of the United States" who wield substantial executive authority. *See Lucia v. SEC*, 138 S. Ct. 2044, 2051–55 (2018). Yet they are, as explained below, at least doubly insulated from the President's removal authority. That multi-layer protection means that "[t]he President is stripped of the power" that the Supreme Court's "precedents have preserved, and his ability to execute the laws—by holding his subordinates accountable for their conduct—is impaired." *Free Enter. Fund*, 561 U.S. at 496. Such an arrangement is unconstitutional, and Burgess must be able to challenge it to obtain meaningful relief.

1.    **FDIC ALJs Are Inferior Officers Who Exercise Significant Executive Power.**

As this Court has recognized, FDIC ALJs qualify as "inferior Officers." *See Burgess v. FDIC*, 871 F.3d 297, 303 (5th Cir. 2017). Their positions are "'established by Law,'" and they "'carry out important functions' over which they 'exercise significant discretion.'" *Id.* at 302 (cleaned up) (quoting *Freytag v. Commissioner*, 501 U.S. 868, 881–82 (1991)). In fact, they possess "all powers necessary to conduct" the FDIC's enforcement proceedings, 12 C.F.R. § 308.5(b), in which the rights and interests of companies and individuals hang in the balance.

To that end, FDIC ALJs wield their "broad authority to preside over agency adjudications," *Burgess*, 871 F.3d at 302, while armed with "nearly all the tools of federal trial judges," *Lucia*, 138 S. Ct. at 2053. For instance, they may "receive relevant evidence" and "rule upon the admission of evidence and offers of proof." 12 C.F.R. § 308.5(b)(3). They are empowered to issue subpoenas and protective orders, "take or cause depositions to be taken," "administer oaths," "consider and rule upon" non-dispositive motions, "regulate the course of [a] hearing," limit "the attendance of the public and the media," and "prepare and present to the Board of Directors a recommended decision." *Id.* § 308.5(b)(1)–(2), (4)–(5), (7)–(8), (10). They can impose sanctions on parties. *See id.* §§ 308.25(h), 308.26(c), 308.27(d), 308.108(d)(1). And they may "do all other things necessary and appropriate to discharge the duties of a presiding officer." *Id.* § 308.5(b)(11).

In short, FDIC ALJs exercise significant authority to "shape the course and scope" of the adversarial proceedings before them. *Burgess*, 871 F.3d at 303; *see Lucia*, 138 S. Ct. at 2053. As a result, "they are sufficiently important to executing the laws that the Constitution requires that the President be able to exercise authority over their functions." *Jarkesy*, 34 F.4th at 464.

## 2. FDIC ALJs Are Doubly Insulated From The President's Removal Authority.

Despite the substantial executive power entrusted to FDIC ALJs, they enjoy a constitutionally intolerable level of protection from the President's oversight.

Congress cannot "commit[] substantial executive authority to officers" who are shielded by even "two layers of for-cause removal" protection. *Free Enter. Fund*, 561 U.S. at 505; *see Jarkesy*, 34 F.4th at 463–64. Such double insulation "not only protects [the officer] from removal except for good cause, but withdraws from the President any decision on whether that good cause exists" in the first place. *Free Enter. Fund*, 561 U.S. at 495. The decision is instead vested in intermediaries not "subject to the President's direct control." *Id.* And thus, "the President is no longer the judge of the [officer's] conduct." *Id.* at 496. The result is that the President "can neither ensure that the laws are faithfully executed, nor be held responsible for [the officer's] breach of faith." *Id.*

The statutory scheme here is akin to those repudiated in *Free Enterprise Fund* and *Jarkesy*. As in those cases, at least "two layers of insulation impede[] the

President's power to remove [FDIC] ALJs based on their exercise of the discretion granted to them." *Jarkesy*, 34 F.4th at 465. First, ALJs may be removed "only for good cause established and determined by the Merit Systems Protection Board." 5 U.S.C. § 7521(a). And second, the members of that Board are themselves removable "by the President only for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 1202(d). Such "dual for-cause limitations . . . contravene the Constitution's separation of powers." *Free Enter. Fund*, 561 U.S. at 492. And they render the statutory scheme unconstitutional. *See id.* at 495–98; *Jarkesy*, 34 F.4th at 465.

In fact, the FDIC's ALJs are even less accountable than those of the SEC. The decision to seek removal before the Merit Systems Protection Board is committed to "the agency in which the administrative law judge is employed." 5 U.S.C. § 7521(a). But unlike the SEC, the FDIC does not directly employ its ALJs. Instead, it relies upon a "pool of administrative law judges" housed in the Office of Financial Institution Adjudication ("OFIA"), an inter-agency body that serves the FDIC, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve Board, and the National Credit Union Administration. *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, § 916, 103 Stat. 183, 486; 12 U.S.C. § 1813(q); 12 C.F.R. §§ 308.3, 308.103.

That unique inter-agency structure blurs the lines of accountability even more than in *Jarkesy*. The decision whether to initiate a removal action is not even vested

in a single agency's head; instead, four agencies collectively supervise OFIA by ad hoc agreement. With exceptions not relevant here, the agreement states that "[a]ll decisions relating to [OFIA]" must be made by an "inter-agency committee" comprised of representatives from each of the four agencies. ROA.239 ¶ 3. And any effort to remove an ALJ requires, not just a majority, but complete unanimity. *See id.* ¶ 2 ("Any change to the Office Staff personnel," including to ALJs, "shall be subject to the prior written approval of all Agencies.").

This sort of "diffusion of accountability" in the Executive Branch is precisely what the Framers sought to prevent. *Free Enter. Fund*, 561 U.S. at 497; *see Seila Law*, 140 S. Ct. at 2203. The public cannot "determine on whom the blame or the punishment . . . ought really to fall" for matters involving an FDIC ALJ. The Federalist No. 70, at 426 (Alexander Hamilton). For "safely encased within a Matryoshka doll of tenure protections," the ALJ stands "immune from Presidential oversight, even as [she] exercise[s] power in the people's name." *Free Enter. Fund*, 561 U.S. at 497. The law is settled that "Congress cannot limit the President's authority in this way." *Id.* at 514.

**B.    The District Court's Remedial Holding Is Flawed.**

The District Court acknowledged that Burgess's constitutional challenge to the ALJ's "removal protections" had "merit," but found it nonetheless could not grant relief. ROA.344. That was incorrect.

Once again, *Free Enterprise Fund* controls.   There, the Public Company Accounting Oversight Board initiated a formal investigation into a firm's auditing procedures.   561 U.S. at 487.   The firm then sought "an injunction preventing the Board from exercising its powers," arguing that the Board's members were unconstitutionally insulated from the President's removal power.   *Id.*   After holding the multi-layer tenure protections were "incompatible with the Constitution's separation of powers," *id.* at 498, the Court turned to the remedy.   And it held that the firm was "entitled to declaratory relief sufficient to ensure that" the law would "be enforced only by a constitutional agency accountable to the Executive."   *Id.*   The "separation-of-powers violation" loomed over the Board's ongoing investigation, and that created "a 'here-and-now' injury" for which the Court could afford prospective relief.   *Id.* at 513 (quoting *Bowsher*, 478 U.S. at 727 n.5).

That remedial holding makes eminent sense.   After all, the decision-making processes of officers who are effectively shielded from removal will naturally differ from those who recognize their accountability to the President.   The Executive too may act differently in supervising the actions of those officers.   So, to ensure that only accountable officials will exercise the executive power, private parties like Burgess must be able to enforce "[t]he chain of dependence between those who govern and those who endow them with power" in an ongoing proceeding.   *Collins v. Yellen*, 141 S. Ct. 1761, 1797 (2021) (Gorsuch, J., concurring in part).   Upholding

that sort of "structural protection[] against abuse of power [is] critical to preserving liberty." *Free Enter. Fund*, 561 U.S. at 501 (citation omitted). And that is particularly true for pending adjudications that threaten to impose liabilities or strip the challenger of his rights. If the request for prospective relief succeeds, then the previously shielded officer's "presumed desire to avoid removal" will create "here-and-now subservience" to the President and his obligations under the Take Care Clause. *Bowsher*, 478 U.S. at 727 n.5 (citation omitted).

That altered arrangement serves to protect the challenger from the whims of an unelected and unconstitutionally insulated bureaucrat as the proceeding unfolds. And it is why Burgess is "entitled to [the] declaratory relief" he seeks here. *Free Enter. Fund*, 561 U.S. at 513. His removal challenge is meritorious under *Jarkesy*, and there is no reason to deprive him of "an administrative adjudication untainted by separation-of-powers violations." *Cochran*, 20 F.4th at 210 n.16.

In concluding otherwise, the District Court relied on *Collins v. Yellen*, 141 S. Ct. 1761, and *Community Financial Services Association of America, Limited v. CFPB*, 51 F.4th 616 (5th Cir. 2022) ("*CFSA*"), *cert. granted*, 2023 WL 2227658 (U.S. Feb. 27, 2023). *See* ROA.344–46. But neither supports the District Court's decision.

In *Collins*, the "only" remedial question "concern[ed] *retrospective* relief." 141 S. Ct. at 1787 (emphasis added). And even there, the Court remanded for the

lower courts to "resolve[] in the first instance" whether the "unconstitutional removal restriction inflicted harm." *Id.* at 1789. Accordingly, the Court in *Collins* had no occasion to consider the availability of prospective relief for ongoing separation-of-powers violations like this one. In these circumstances, the remedial holding in *Free Enterprise Fund*—not *Collins*—controls. *See also Cochran*, 20 F.4th at 210 n.16 (explaining that *Collins* does not apply where a party seeks to avoid an "enforcement proceeding presided over by an unconstitutionally insulated ALJ").

The District Court's reliance on *CFSA* was similarly misplaced. There, the plaintiffs sought to "invalidate[]" a previously issued CFPB rule. 51 F.4th at 631. Given the nature of that challenge, this Court distilled a three-part test for cases where a plaintiff seeks "a *rewinding* of agency action" based on a "removal violation." *Id.* at 632 (emphasis added) (quoting *Collins*, 141 S. Ct. at 1801 (Kagan, J., concurring in part)). But it said nothing about a challenger seeking prospective relief to ensure that, going forward, he "will be" subject to a proceeding before an officer who is "accountable to the Executive." *Free Enter. Fund*, 561 U.S. at 513. Thus, *CFSA* is simply off-point.

Finally, even if this Court could read *CFSA* as broadly as the District Court did, *Free Enterprise Fund* would still control. Where a panel overlooks "prior Supreme Court precedent," this Court must "decline[] to follow [the conflicting] panel decision" and instead apply the governing Supreme Court decision. *Thompson*

*v. Dallas City Attorney's Off.*, 913 F.3d 464, 467–68 & nn. 16, 17 (5th Cir. 2019). The *CFSA* panel did not cite *Free Enterprise Fund*. Nor did it cite this Court's previous en banc decision in *Cochran*, which reaffirmed that an enforcement target is entitled to prospectively "seek[] an administrative adjudication untainted by separations-of-powers violations." 41 F.4th at 210 n.16; *see also id.* at 233 (Oldham, J. concurring) ("A person subject to an unconstitutional adjudication should at least be able to sue for declaratory relief requiring a constitutionally structured proceeding." (citing *Free Enter. Fund*, 561 U.S. at 513)). Since the panel could not overrule that earlier en banc opinion either, that is all the more reason to limit *CFSA* to its readily distinguishable facts.

## CONCLUSION

For the foregoing reasons, the Chamber respectfully requests that this Court affirm the preliminary injunction.

Respectfully Submitted,

JENNIFER B. DICKEY
KEVIN R. PALMER*
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, N.W.
Washington, DC 20062

*Admitted in Massachusetts only.
Practicing under the supervision of
members of the D.C. Bar.

/s/ Steven A. Engel
STEVEN A. ENGEL
    Attorney of Record
MICHAEL H. MCGINLEY
JUSTIN W. AIMONETTI
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

BRIAN A. KULP
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

Counsel for Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2023, I caused the foregoing *amicus curiae* brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit. The Court's CM/ECF system was used to file the brief, and service will therefore be accomplished by the CM/ECF system on all CM/ECF-registered counsel.

Dated: April 7, 2023

*/s/ Steven A. Engel*
Steven A. Engel

DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Attorney of record for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,495 words, excluding those portions of the brief exempted by Fed. R. App. P. 32(f).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-pt font.

Dated: April 7, 2023

*/s/ Steven A. Engel*
Steven A. Engel
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Attorney of record for* Amicus Curiae